Filed 1/15/25  In re Z.G. CA4/2
See Dissenting Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Z.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>A.G.,<br><br>  Defendant and Appellant. | E083710<br><br>(Super.Ct.Nos. J286808 & J289966)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

1

At a Welfare and Institutions Code section 366.26[1] hearing, the juvenile court terminated the parental rights of defendant and appellant A.B. (mother)[2] as to Z.G. (born May 2020) and A.G. (born July 2021) (collectively minors). On appeal, mother contends the court erred in removing minors from mother's custody and that there was no statutory basis for terminating her parental rights as to A.G. because mother had never received reunification services with respect to her. Mother further argues the court erred in declining to apply the beneficial relationship exception to terminating parental rights. We affirm.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND[4]

On September 28, 2020, personnel from plaintiff and respondent, San Bernardino County Children and Family Services (the department), received an immediate response referral alleging severe and general neglect. The reporting party indicated that mother had taken then four-month-old Z.G. to the emergency room as she was not making eye contact, her eyes were rolling back, and her body was stiff. Z.G. tested positive for methamphetamine. The reporting party indicated mother appeared to be under the influence of drugs.

---

[1] All further statutory references are to the Welfare and Intuitions Code.

[2] Father is not a party to the appeal.

[3] Mother filed a petition for writ of habeas corpus (*In re A.G.*, case No. E084563), which we ordered to be considered with the appeal. We shall resolve the petition by separate order.

[4] By order dated May 17, 2024, we incorporated the record in case No. E081423.

The responding social worker interviewed mother, who reported she had left Z.G. with the maternal grandmother; 30 minutes later, the maternal grandmother called, and stated that Z.G. was acting differently. Mother then took her to the hospital.

Mother and the maternal grandmother both denied using methamphetamine. Mother admitted using marijuana. The maternal grandmother reportedly had a history of drug use, of which mother was aware. Mother believed the maternal grandmother was using drugs.

A family friend stated she believed the maternal grandmother and father used drugs. It was reported that father used marijuana while holding Z.G.[5] The social worker took Z.G. into protective custody. Z.G. remained at the hospital.

On September 30, 2020, the department filed a juvenile dependency petition alleging parents had substance abuse problems (b-1, b-3, & b-7); that mother left Z.G. with the maternal grandmother, where she ingested methamphetamine (b-2); that mother and father engaged in acts of domestic violence in the presence of Z.G. (b-4 & b-5); that father knew or should have known of mother's substance abuse (b-6); and that father's whereabouts were unknown (g-8). On October 1, 2020, the court detained Z.G.

In the October 19, 2020, jurisdiction and disposition report, the social worker wrote that the b-4, b-5, and g-8 allegations were not supported by the evidence. Therefore, the social worker requested the court find those allegations not true. The

---

[5] The social worker indicated the parents "may have" engaged in domestic violence; the information apparently derived from mother's "having a red scar on the right side of her chin and several small bruises on both forearms."

3

social worker recommended the court find the remaining allegations true, remove Z.G. from parents' custody, and provide parents reunification services. The social worker further requested the court grant authority to return Z.G. to parents under family maintenance services within three months as deemed appropriate.

The social worker interviewed mother on October 6, 2020. Mother denied having a substance abuse problem. However, she admitted using marijuana twice weekly and drinking once a week. Mother tested negative for all substances on September 29, 2020. On October 6, 2020, she tested positive for marijuana.

Mother had left Z.G. with the maternal grandmother, maternal aunt, and maternal uncle, who lived in a different room in the same hotel as her. The maternal grandmother and maternal aunt were both on probation and required to submit to random drug testing; however, as far as mother knew, they were not using illicit substances. Mother believed one of the family members must have used methamphetamine, failed to wash their hands, and Z.G. ingested it due to a family member's handling of her bottles.

The social worker referred parents to parenting classes, individual counseling, and Al-Anon meetings. Parents agreed to random and on-demand drug testing, on the condition that they not have to complete substance abuse treatment programs upon negative testing.

The social worker scheduled supervised visitation a minimum of once weekly for two hours. She requested authority to allow unsupervised visits when deemed

4

appropriate.  Parents filed waivers of rights agreeing to submit on the petition and the social worker's reports.

At the hearing on October 22, 2020, the court dismissed the b-4, b-5, and g-8 allegations.  The department also asked the court to dismiss the b-1 allegation and amend the b-7 allegation.  The court struck the b-1 allegation and amended the b-7 allegation. The court found the remaining allegations true, removed Z.G., and granted parents reunification services.

In the status review report filed April 12, 2021, the social worker recommended Z.G. be returned to parents' home under family maintenance services.  The social worker noted Z.G. had been placed in the home of her paternal great-grandmother.

Parents completed anger management/parenting classes on January 11, 2021. They both completed individual counseling.  Parents attended eight Al-Anon group meetings.  Parents missed two drug tests in December 2020, which the department excused.  Mother had tested negative seven times.  Father had tested negative on six occasions.

The social worker observed, "The parents share tasks and respectfully request assistance from one another when engaged in the activities they do with [Z.G.].  The paternal great-grandmother has reported how lovingly the mother bathed her daughter and got her ready for bedtime during one of her evening visits.  They have also participated in the therapeutic services . . . to ensure that they are meeting and assisting with [Z.G.'s] developmental needs."

5

Parents had not missed any visits. Unsupervised visitation began on February 18, 2021: "Initial[ly] the visits were all day for three . . . days[;] now they have every day, all-day visits with weekend visits being overnight and an additional overnight visit during the week." Z.G. appeared "bonded to both of her parents as well as to her extended paternal relatives with whom she is placed."

On April 22, 2021, the court approved the case plan and ordered Z.G. returned to parents' home but retained jurisdiction over her. Parents were to maintain contact with the social worker and inform her within 24 hours of any change in Z.G.'s residence. The court found parents had made substantial progress toward alleviating or mitigating the causes necessitating placement. The court authorized the department to request dismissal of the case if appropriate.

In July 2021, mother gave birth to A.G. On July 20, 2021, family members reported concerns that father was using illicit substances again and knew how to falsify test results. They reported father had a history of suicidal and self-harm behaviors. Mother reported an incident of domestic violence.

Mother had moved out of the family home. Parents had separated. Father had missed five out of nine drug tests. Father failed to show for a children and family team meeting and a subsequently scheduled meeting with the social worker. Mother had one missed drug test. She subsequently tested negative for all substances.

On July 27, 2021, the department filed a supplemental petition as to Z.G. alleging that father engaged in acts of domestic violence against mother (b-1 & s-2) and had failed

6

to drug test on five occasions (s-3).  On the same date, the department also filed a dependency petition as to A.G. alleging that father engaged in domestic violence against mother (b-1), failed to drug test five times (b-2), and that Z.G. had been adjudged a dependent of the juvenile court (j-3).  The social worker recommended minors remain in mother's home with family maintenance services but that reunification services be offered to father.

At the hearing on July 28, 2021, the court detained minors from father on both petitions.  Minors were to be maintained in mother's home.

In the August 12, 2021, jurisdiction and disposition reports, the social worker recommended the court find the allegations in the petitions true, continue minors in mother's home with family maintenance services, and provide reunification services for father.  Mother reported she had kicked father out of the home for using methamphetamine.  Mother said "father's suicide attempts include stabbing himself with glass, placing things around his neck, and driving reckless[ly]."

Mother had agreed to continue to participate in services.  The social worker issued her referrals for counseling and domestic violence services.  Mother said she last used marijuana in August 2020, and last consumed alcohol on July 16, 2021.  Mother said she had been admitted to the hospital due to kidney and liver issues related to alcohol use when she was two to four weeks pregnant with Z.G.  "As part of mother's current open [family maintenance] case with the other sibling she was court ordered to participate in

and referred to the following: case management, counseling, parent education, substance abuse services, and transportation services."

At the hearing on August 18, 2021, mother submitted on the recommendation of family maintenance services. The court found the allegations in the petitions true.

As to disposition, the department's and minors' counsel requested that mother's plan include a requirement that she test for alcohol, and that if she tested positive she be required to participate in an outpatient treatment program. Mother had "no objection to those requests." The court removed minors from father's legal custody, continued minors in mother's home with family maintenance services, and granted father reunification services. On September 1, 2022, the court approved the modified case plan requiring mother to participate in a domestic violence program, general counseling, and substance abuse testing.

In the status review report filed February 8, 2022, the social worker recommended the matter be continued for 30 days with a recommendation to dismiss the cases as to mother and terminate father's reunification services. The social worker had limited contact with father over the reporting period; he had not been participating in services, including visitation.

Mother had been attending individual counseling, domestic violence classes, and had tested negative on five occasions. However, mother had failed to show twice for testing. Mother had an active bench warrant issued on December 16, 2021, for missing a

8

court date. The department requested the continuance to enable mother to resolve the warrant prior to dismissal of the dependency matters as to her.

On February 17, 2022, the social worker filed an additional information for the court reflecting mother had completed her individual therapy and domestic violence classes. Mother reported that she was unable to go to court to clear her outstanding warrant due to illness. The department requested a 45-day continuance to allow mother to clear the warrant prior to dismissal of the dependency matters. At the hearing on February 18, 2022, the court continued the matters.

In an additional information for the court filed April 7, 2022, the social worker reported that mother had been in and out of the hospital; she had been referred to a specialist. Mother missed her hearing scheduled on March 14, 2022, to clear her warrant. Mother requested another hearing, which was scheduled for April 14, 2022. Mother continued to test negatively for illicit substances. The department recommended they continue to provide family maintenance services to mother until she cleared her warrant.

At the hearing on April 7, 2022, mother's counsel submitted on the department's recommendation. The court terminated father's reunification services. The court continued minors in the custody of mother under family maintenance services.

In the October 7, 2022, additional information for the court, the social worker reported that mother was living in the home of the paternal aunt. Mother was sleeping in the living room with A.G. in a crib and Z.G. on an air mattress. The social worker

informed mother "she should not be co-sleeping with the minor." Mother responded that the living conditions were temporary, and she was actively looking for a new home.

The social worker noted that records reflected that mother had failed to test on five occasions. Mother contended she had tested on those dates and would provide the social worker with documentation. Mother reported "that she took care of her warrant by completing driving school . . . ." The social worker requested a continuance to allow mother for find suitable housing and to verify the missing drug tests.

At the hearing on October 7, 2022, mother's counsel requested a five-week continuance for mother to obtain housing. The court granted the continuance.

The social worker recommended in the status review report filed November 7, 2022, that minors remain in mother's custody under family maintenance services. Mother had moved in with the maternal aunt. Z.G. had been diagnosed with a heart murmur; the social worker was unaware if mother had followed up for treatment. Since February 22, 2022, mother had 12 no shows and nine negative drug tests. Mother could not find drug test receipts for the months of August through October due to moving. The social worker also noted she did not have verification that mother had attended the requisite eight Al-Anon meetings.

At the hearing on November 8, 2022, at which mother was not present, minor's counsel objected to the department's recommendation. Minor's counsel noted mother had failed to show for a number drug tests, had not provided proof of attendance at AA or NA meetings, and it did not appear mother had followed up with treatment for Z.G.'s

10

heart murmur. Mother's counsel requested a week to contact mother and obtain the required information. The court continued the matters for 30 days to provide mother time to drug test and obtain receipts.

In an additional information for the court filed on December 8, 2022, the social worker reported that mother stated she was advised that she did not necessarily need to follow up with respect to Z.G.'s diagnosed heart murmur. The social worker advised her to make an appointment with a pediatrician; mother said she would do so.

The testing center had erroneously failed to place mother on the testing list; the error had since been corrected; however, mother still needed to test. Mother reported that she had completed all the required Al-Anon meetings and had been cleared by the previous social worker. The current social worker could find no evidence in the file supporting mother's contention. The social worker noted that mother still needed to complete four more sessions of individual counseling. The department requested "a 60 day extension, so the Department could provide [the] court through ample [*sic*] results with drug testing, individual counseling completed, heart murmur results[,] and Al-anon meetings."

At the hearing on December 9, 2022, the department informed the court "that Mother did attend the doctor's appointment for the heart murmur yesterday and was referred to a cardiologist. I don't know the date of the appointment with the cardiologist, but we'll be following up on that issue for the next court date."

11

Minors' counsel requested the continuance be limited to 30 days. The department responded, "My concern is that we had an issue with the drug tests and now that's sorted out. I want to get minors' counsel the drug test result for the next court date and some attendance sheets. Honestly, I don't know how quickly one gets in to see a cardiologist. I think availability of physicians can vastly differ. I'm concerned that we may not have that in 30 days. Would the Court and minors' counsel be open to perhaps 45 days, with the hope that we can at least get some results for some drug tests?" The court continued the matters to January 23, 2023.

In an additional information filed January 19, 2023, the social worker reported she "was made aware of [an] error in regard to mother['s] . . . drug test results. It is noted that mother has tested negative (28) twenty-eight times. The Department was unaware of the errors due to the misinformation retrieved prior to the December 9, 2022, hearing." The department also appears to have conceded that mother was not required to complete any additional 12-step meetings. Mother had an appointment with a cardiologist for Z.G. on February 23, 2023. The social worker recommended the dependencies be dismissed.

At the hearing on January 23, 2023, minors' counsel requested a continuance because mother had moved, and someone needed to check the home. The court continued the matters.

On February 7, 2023, the social worker filed an additional information for the court, in which she reported that mother had completed her case plan including "individual counseling, domestic violence, attended Al-anon[,] and has tested clean for

12

the past two years." "The case has remained open due to mother having a warrant, mother has cleared up her prior warrant, mother has completed her case plan. Mother has expressed her frustration that the case is still open when she has completed the case plan. The Department does not see that keeping the case open is benefitting her or the children." "Mother has benefitted from the services that she had completed in 2022." Mother had missed a recent drug test; however, she subsequently tested negative. "The Department is requesting that the case remain open for three weeks, so the on demand test results could be provided to the intake worker and the referral could be closed." The court continued the matters.

On February 6, 2023, the social worker went to the home of the paternal aunt, who informed the social worker she had asked mother to leave the residence due to mother's drinking. The paternal aunt said she did not see mother drinking, but she could "'identify the signs of drinking.'" She saw a bottle in the home but could not identify the type of alcohol it contained. The paternal aunt stated mother would pinch minors and tell them to shut up.

The social worker reported that mother had missed eight drug tests since December 2022, and had tested negative once. The social worker wrote that mother had a history of missing drug tests. "As of the writing of this report the mother has completed the services in her court ordered case plan but has been re-referred for attending 12 Step meetings and testing." Mother was not making the minors available for the social worker to check.

On March 13, 2023, the department filed supplemental petitions alleging mother was not cooperating with the court ordered case plan; she was also not drug testing or advising the department about her and minors' whereabouts. On March 14, 2023, the court ordered minors detained from mother's custody on the supplemental petitions. On March 16, 2023, minors were taken into protective custody.

In the April 3, 2023, jurisdiction and disposition report, the social worker recommended the court find the allegations in the petitions true, remove minors, and grant mother reunification services. The social worker noted, "Mother has had the children in her care since August 18, 2021." "During this review period mother has been uncooperative with the Department. [The social worker] reviewed the case plan with mother [on] October 27, 2022, November 21, 2022, and December 22, 2022. Mother had stated that she had completed the case plan but was unwilling to attend 12 step meetings, retain a sponsor, agreed to test and proceeded to test once since November 21, 2022." According to the social worker, mother did not have stable housing, was abusing alcohol, and was evasive about her location. The social worker had requested mother complete three on-demand tests, all which mother missed.

At the hearing on April 4, 2023, the department requested "a brief continuance as the recommendation is legally inappropriate. Mother is out of time for further services." The court continued the matters.

In an additional information for the court filed April 11, 2023, the social worker recommended the court terminate mother's services and set the section 366.26 hearing.

14

At the hearing on April 12, 2012, at which mother was not present, the department requested a continuance because "[m]other was sick in the hospital with jaundice." Mother's counsel was unaware of the circumstances. The court continued the matters to May 12, 2023.

On May 8, 2023, the social worker filed an additional information for the court in which she reported that they held a children and family team meeting at the hospital with mother on May 2, 2023. Mother agreed to complete outpatient and substance abuse testing. Nonetheless, "the Department recognizes that legally mother's services are to be terminated." The social worker reported that "mother and children have a strong bond."

At the hearing on May 12, 2023, at which mother was not present, mother's counsel requested the court strike the s-1 allegation, or, in the alternative, strike the language indicating mother had not advised the department about her and minors' whereabouts. Counsel requested services be continued.

The court found the s-1 allegation true as amended to strike the language regarding the whereabouts of mother and minors. Minors' counsel believed "these children are adoptable and I do not want them to linger in foster care any longer than they have had to." The court continued the disposition hearing. In the May 16, 2023, additional information for the court, the social worker recommended the court set the section 366.26 hearing to establish a permanent plan of adoption.

At the hearing on May 16, 2023, at which mother was not present, mother's counsel reiterated his request that the court continue services for mother. Minors'

15

counsel submitted on the recommendation for the setting of a section 366.26 hearing on adoption. The court asked, "Isn't the mother out of time statutorily for services to be provided?" The department responded, "Correct, Your Honor." The court removed minors from mother, terminated her services, and scheduled the section 366.26 hearing.

On May 30, 2023, mother filed a notice of intent to file a petition for extraordinary writ as to both minors. On July 5, 2023, this court dismissed the case for petitioner's failure to timely file a motion for relief from default for having failed to timely file the writ petition.

On June 25, 2023, the social worker filed an additional information for the court, in which she reported that the paternal great-grandmother said that mother's liver was failing. The paternal great-grandmother wished to adopt minors.

In the section 366.26 report filed December 4, 2023, the social worker requested additional "time . . . to transfer the case to the adoption's unit and for the adoptions unit to complete [a] home assessment." The department had placed minors with the current caregivers on June 28, 2023; they wished to adopt minors. "The placement is stable[,] and the children are doing well in the home." Mother had supervised visits with minors twice weekly for two hours. The visits were reported to be "great."

At the hearing on December 5, 2023, the department requested a 120-day continuance. Minors' counsel requested a shorter continuance: "The children have been with the caregiver, I think, now between around seven months and they're doing extremely well. My experience has been that the caregiver has been very cooperative[,]

and I'm satisfied that the placement is not only appropriate, but very beneficial to the children."  The court set the contested section 366.26 hearing for February 6, 2024.

The department requested that mother's visits be reduced.  Mother's counsel observed, "The report indicates that Mother's been having visits twice a week, for two hours, supervised, and that visits have been going well.  So I would ask that . . . if the Court is inclined to grant the request to reduce visits, I would ask visits remain twice a month, Your Honor."  Minors' counsel noted, "I'm fine with authority to increase, but at this juncture, we want the children to settle in.  I don't want them—given their ages . . . to have . . . conflict or confusion issues.  There's also the fact that the caregivers have to facilitate [visits]."  The court ordered mother's visitation reduced to "two times per month, for two hours, county agency has authority increase as to frequency, duration, and delegate supervision."

On February 5, 2024, the department requested an additional "continuance to allow adoptions to complete a thorough assessment of [the] family."  At the hearing on February 6, 2024, the department requested an additional 75 days.  The court set the matters for April 22, 2024.

On April 10, 2024, the social worker filed a first addendum section 366.26 report, recommending the court terminate parents' parental rights and implement a permanent plan of adoption.  The social worker reported that minors were generally adoptable and were likely to be adopted.  They were "very bonded" to the prospective adoptive parents, who were relatives, as well as other children, an adult uncle, and a grandfather, all of

17

whom also lived in the home.  The prospective adoptive parents were interactive with minors and kept "up with their energy."

At the section 366.26 hearing on April 22, 2024, mother testified that she had been visiting with minors.  During her latest visit in early April, minors came into the house and "said, 'Mommy,' and then we continued to proceed, started coloring."  They gave her a hug.  "Then we did go outside.  They like to be outdoors and ride their bikes."  At the end of the visit, Z.G. "was kind of sad.  I told her she would be seeing me again soon.  And then [minors] walked down and gave me a hug.  I put them in the car[,] and they said they love me and that's it."

At her March visit with minors, they went outside and played; they had snacks.  Minors addressed her as "'Mommy'" and "Mom.'"  Z.G. "usually is sitting on top of me, [A.G.] is sitting on the side.  [A.G.'s] more affectionate toward my boyfriend.  So [A.G.'s] very close with him.  So me and [A.G.] have a bond, too."

Mother's bond with Z.G. was stronger.  "I mean, when I first came over, she's like—starts to cry a little bit, when she sees me and stuff.  When she leaves, she kind of throws a fit or tantrum, but lately we are working through it, talk to her, tell her she's going to come back and see me."  "[W]e have a bounce house.  We put that up, play with balloons, color, blow bubbles."  When the visit ended, Z.G. was upset; "she started to cry."

Mother's counsel argued that mother and minors "are bonded."  "They look forward to seeing her at the visits and the children refer to her as Mom."  "I do think there

is evidence of a bond such that severance would not be in the children's best interest—severance of that relationship, that is. So we would ask the Court find that it would not be in the children's best interest to follow the recommendation to terminate parental rights. Instead, Mother requests the Court order a lesser plan of legal guardianship." Minor's counsel requested the court follow the department's recommendation.

The court noted that minors "have been out of [mother's] care for more than a year at this point." "They have been in their current placement for over six months. They're bonded to their prospective adoptive parents. The prospective adoptive parents are willing and committed to the needs of the children on a permanent basis, and they desire to keep them with family, keep them safe and loved." "The social worker reports that the children appear to be emotionally bonded to the prospective adoptive parents." "The children have been placed with the prospective adoptive parents since [*sic*] March 16, 2023."[6]

"In the [section 366].26 report of December 5th, 2023, the social worker reported the children are doing well in the home." Z.G. "presents as a happy three year old, and there's no indication that she is in need of therapy, based on comments by the caregiver." "In the addendum report submitted for today, it also reflects a bond between the children and the caregivers." The court found minors "both generally specifically adoptable."

The juvenile court expressly mentioned *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) as the applicable law in determining whether to apply the beneficial

---

[6] The department took minors into protective custody on March 16, 2023. The department placed minors with the prospective adoptive parents on June 28, 2023.

relationship exception to termination of parental rights. "In this case, the children have been removed from the mother for over a year and have been in . . . their placement since March 2023.[7] The Court is finding that the mother has met her burden of proof as to regular visitation and contact between the children." The court also found that mother and minors were bonded.

"As to the third element, whether termination of parental rights would be detrimental, the Court is finding that the mother has not met the burden of proof. While [Z.G.] may cry and get upset at some point in the visits, the mother described the last visit at the beginning of April. At the end of the visit, the children were kind of sad. There was no testimony as to the visit in April that there was any distress." "It does not appear [Z.G.] is distressed at the end of every visit. There's been no evidence presented that she's not able to be comforted or has ongoing issues after the visit. Mother's own testimony was that [A.G.] has a stronger bond with Mother's boyfriend." "[T]he Court is finding that the mother has not met the burden of proof as to third element. Court is finding it would not be detrimental to the children to terminate parental rights." Thus, the court terminated parents' parental rights as to both minors.

---

[7] See footnote six, *ante*.

## II. DISCUSSION

A. The Court was not Required to Find that Reunification Services had Been
Bypassed.

Mother contends that pursuant to *In re DeLonnie S.* (1992) 9 Cal.App.4th 1109
(*DeLonnie S.*), prior to terminating her parental rights as to A.G., the juvenile court was
required to find that services as to A.G. had been either bypassed or terminated. We
disagree.

The court in *DeLonnie S.* noted that "the juvenile court may terminate a parent's
rights when it makes: (1) a finding at the permanency planning hearing that the
dependent child is likely to be adopted; *and* (2) any one of five additional findings listed
in subdivision (c)(1) of section 366.26, each of which is made at a hearing prior to the
permanency planning hearing. (*Id*. at p. 1113, fn. omitted, italics added.) "In other
words, the fact that a dependent child is likely to be adopted will not *by itself* support an
order terminating parental rights. Rather, *in addition* the Legislature has identified any
one of five specific findings as sufficient bases for a termination order when the
dependent child is likely to be adopted." (*Ibid*., italics added [Failure of juvenile court to
make one of the requisite additional findings required reversal of order terminating
parental rights].)

Those five required findings were as follows: (1) that reunification services would
be bypassed; (2) that the whereabouts of a parent had been unknown for six months;
(3) that the parent had failed to visit or contact the child for six months; (4) that the parent

21

had been convicted of a felony indicating parental unfitness; (5) or that the child could not or should not be returned to his or her parent. (Former § 366.26, subd. (c)(1); *In re DeLonnie S.*, *supra*, 9 Cal.App.4th at p. 1113, fn. 4.)

However, the Legislature subsequently amended section 366.26 to require the court to terminate parental rights if the court found the minor adoptable. Although one of the previously requisite additional findings would support a finding of adoptability, none of those findings were any longer required. (Amended by Stats. 1998, ch. 572 (Assem. Bill No. 2310), § 1, operative Jan. 1, 1999.) Thus, because the court was not required to find that reunification services as to A.G. had been bypassed, the court did not err in terminating mother's parental rights because it had determined that A.G. was adoptable.

B. Jurisdictional Issues

Mother requests that we "consider the arguments which should have been made at the jurisdictional and dispositional hearings on the supplemental petition, and in the writ petition which should have been filed thereafter, . . ." Mother contends counsel should have filed a petition for extraordinary writ raising the following issues: (1) the court erred in removing the children because substantial evidence did not support a finding of detriment; and (2) the court unlawfully set the section 366.26 hearing before providing mother with statutorily required reunification services as to A.G.[8] We hold that we lack jurisdiction to address these issues.

---

[8] Mother's petition for writ of habeas corpus challenges these orders based on mother's counsel's purported rendition of prejudicial ineffective assistance of counsel.

22

1. Scope of Appeal

"'[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction.' [Citations] '"[O]nce the deadline [to appeal] expires, the appellate court has no power to entertain the appeal."'" (*In re J.F.* (2019) 39 Cal.App.5th 70, 74-75.) "'"'Our jurisdiction on appeal is limited in scope to the notice of appeal and the judgment or order appealed from." [Citation.] We have no jurisdiction over an order not mentioned in the notice of appeal.' [Citation.]" (*Id.* at p. 75.)

"Generally, we must liberally construe a notice of appeal in favor of its sufficiency. [Citations.] A notice of appeal shall be '"liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced."' [Citations.]" (*In re J.F.*, *supra*, 39 Cal.App.5th at pp. 75-76.)

"But there are limits to our ability to liberally construe a notice of appeal. 'The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all.' [Citations.]" (*In re J.F.*, *supra*, 39 Cal.App.5th at p. 76.) "Therefore, when a notice of appeal manifests a '"clear and unmistakable"' intent to appeal only from one order, we cannot liberally construe the notice to apply to a different, omitted order. [Citations.]" (*Ibid.* [court lacked jurisdiction to consider parent's arguments on appeal as to order from which parent did not appeal].)

23

Here, mother's notice of appeal specifies that it is from the juvenile court's order of April 22, 2024, terminating her parental rights as to minors.  No mention of any other order is made.  Mother's appeal does not mention the May 16, 2023, order in which the juvenile court removed minors from mother, terminated her services, and set the section 366.26 hearing.  Mother's notice of appeal is so specific that we cannot read it as reaching the May 16, 2023, orders.  Thus, we have no jurisdiction to reach her claims with respect to them.

2. Timeliness

"One of the most fundamental rules of appellate review is that the time for filing a notice of appeal is jurisdictional.  '[O]nce the deadline expires, the appellate court has no power to entertain the appeal.'  [Citation.]"  (*In re A.O.* (2015) 242 Cal.App.4th 145, 148.)  "'"[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order."  [Citation.]' [Citations.]"  (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Z.S.* (2015) 235 Cal.App.4th 754, 769, overruled on narrow grounds in *In re A.R.* (2021) 11 Cal.5th 234, 243, 251; *id.* at p. 243 [Where mother requested counsel file a notice of appeal, and mother's counsel mistakenly filed the notice of appeal four days late, mother has not "irrevocably lost her right to appeal the termination of her parental rights."].)  "This '. . . rule' holds 'that an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order,' even when the issues raised involve important

24

constitutional and statutory rights. [Citation.]" (*In re Z.S.*, at pp. 769-770; see *In re S.B.*, at p. 532.)

"'Failure to file a petition for extraordinary writ review within the period specified by rule . . . shall preclude subsequent review by appeal of the findings and orders made pursuant to [section 366.26.]' [Citation.]" (*In re Hannah D.* (2017) 9 Cal.App.5th 662, 678; accord, *In re A.A.* (2016) 243 Cal.App.4th 1220, 1239.) "Petitioner's trial counsel, or, in the absence of trial counsel, the party, is responsible for filing any notice of intent and writ petition . . . ." (Cal. Rules of Court, rule 8.450(c).)

"[R]esort to claims of ineffective assistance as an avenue down which to parade ordinary claims of reversible error is also not enough . . . alone, to argue that counsel rendered ineffective assistance by not raising potentially reversible error on" a previously appealable order. (*In re Janee J.* (1999) 74 Cal.App.4th 198, 209.) "[L]ate consideration of ineffective assistance claims defeats a carefully balanced legislative scheme by allowing a back-door review of matters which must be brought for appellate review . . . by earlier appeals, that is, before the point is reached where reunification efforts have ceased and the child's need for permanence and stability become paramount to the parent's interest in the child's care, custody and companionship [citation]." (*Id*. at p. 208.) "[T]o fall outside the waiver rule, defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed. To allow an exception for mere 'reversible error' of that sort would abrogate the review scheme [citations] and turn the question of waiver into a review on the merits." (*Id*. at p. 209.)

Failure to raise ineffective assistance of counsel below forfeits the issue on appeal. (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 715-716.)

Here, mother raises issues on appeal that challenge the finality of the court's rulings on May 16, 2023. Such challenges are only reviewable by timely appeal or petition for extraordinary writ, neither of which were timely pursued by mother. Thus, we are without jurisdiction to address any challenge to those orders.

## C. Beneficial Relationship Exception

Mother contends the court erred in declining to apply the beneficial relationship exception to termination of parental rights. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely

26

permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, as the parties agree, the juvenile court found both that mother had maintained consistent visitation and had a beneficial relationship with minors. Thus, we address only the third prong, detriment.

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental

27

rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Id.* at p. 633.)  "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home."  (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion."  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""  [Citation.]  But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""""  (*Id.* at p. 641.)

Here, mother did not meet her burden of showing a compelling reason that termination of her parental rights would be detrimental to minors.  In other words, mother did not demonstrate that there were exceptional circumstances such that the court should choose an option other than the statutory preference for adoption as the long-term plan for minors.

As the court noted, the only evidence of detriment adduced by mother was that Z.G. cried and became upset at the end of a single visit in March.  Mother testified Z.G.

"was kind of sad" at the end of the visit in April.  Thus, as the court observed, "It does not appear [Z.G.] is distressed at the end of every visit.  There's been no evidence presented that she's not able to be comforted or has ongoing issues after the visit."  Likewise, as the court further observed, there was no evidence that A.G. experienced any distress at her separation from mother, either in between or at the end of visits.

On the other hand, at the time the court terminated mother's parental rights, minors had been out of her custody for over a year.  They had been in the prospective adoptive parents' home for approximately 10 months.  The department had previously placed Z.G. with the prospective adoptive parents when the court initially detained her.  At that time, the department noted minor "appear[ed] bonded . . . to her extended paternal relatives with whom she is placed."

The prospective adoptive parents wished to adopt minors.  The placement was stable, and minors were doing well in the home.  They were "very bonded" to the prospective adoptive parents, as well as other children, an adult uncle, and a grandfather, all who also lived in the home.  The juvenile's court's determination that the beneficial parental relationship exception did not apply was within the court's discretion.

### III.  DISPOSITION

The orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER           

J.

I concur:

RAMIREZ        

P. J.

[*In re Z.G.*, E083710]

MENETREZ, J., Dissenting.

Ana G. (Mother) received ineffective assistance of counsel at the hearing at which the selection and implementation hearing was set, and she likewise received ineffective assistance of counsel when her court-appointed trial counsel chose not to file a writ petition challenging the setting of the selection and implementation hearing. We should accordingly reverse the termination of parental rights, so I respectfully dissent.

The juvenile court removed Mother's older child, Z.G., from Mother's custody in October 2020 at the disposition hearing on a petition under Welfare and Institutions Code section 300 (unlabeled statutory citations refer to this code), and the court ordered the San Bernardino County Department of Children and Family Services (CFS) to provide reunification services to Mother. Mother promptly completed her case plan programs and demonstrated substantive progress in addressing the issues that led to Z.G.'s removal. At the six-month review hearing in April 2021, the court followed CFS's recommendation to return Z.G. to Mother's custody and to order family maintenance services.

In July 2021, Mother gave birth to A.G. That same month, CFS filed a supplemental petition as to Z.G. and an original section 300 petition as to A.G. But the petitions' allegations concerned only the children's father, and at the detention hearing the juvenile court maintained both children in Mother's custody. At the disposition

1

hearing on those petitions, the court continued both children in Mother's custody and ordered family maintenance services for Mother.

The children remained with Mother under court and CFS supervision until the juvenile court detained them from her on supplemental petitions in March 2023. At the disposition hearing on those supplemental petitions, the court removed both children from Mother's custody and followed CFS's recommendation that Mother "receive no family reunification" and that a hearing under section 366.26 be set. The purported basis for declining to order reunification services for Mother was county counsel's statement that "Mother is out of time for further services." Mother's court-appointed trial counsel did not seek writ review of the order denying Mother services and setting the section 366.26 hearing, because counsel believed that Mother "had already been receiving services past the statutory time limit."

The court's ruling was correct as to Z.G. Mother was out of time for reunification services for her older child—Z.G. was removed from her custody at the disposition hearing in October 2020, and reunification services can be provided only for 18 months (or 24 months in certain exceptional circumstances). (See generally §§ 361.5, subd. (a), 366.21, subd. (f), 366.22, subd. (b), 366.25, subd. (a)(1).) But the ruling was erroneous as to A.G. Mother was not out of time for reunification services as to her younger child, because that child had never been removed from her custody or even detained from her until the supplemental petitions were filed in March 2023. Mother's reunification clock as to A.G. had never started to run.

On appeal, CFS argues that the court's error and counsel's dereliction in failing to point out the error in the trial court or to raise it in a writ petition were harmless. CFS reasons that, given that the court was required to terminate reunification services for Mother as to Z.G., the court could have bypassed reunification services for Mother as to A.G. under subdivision (b)(10) of section 361.5.

The argument lacks merit. Under subdivision (b)(10) of section 361.5, the court need not order reunification services for a parent as to a child removed from the parent's custody if the court finds by clear and convincing evidence that "the court ordered termination of reunification services for any siblings . . . of the child because the parent . . . failed to reunify with the sibling" and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling." In determining whether the parent subsequently made a reasonable effort, the court must consider the parent's "efforts made since the removal of the sibling." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 98.) Thus, in order to bypass Mother as to A.G. under that provision, the court would have to find by clear and convincing evidence that even though Mother completed her case plan in the first six months after Z.G.'s removal, and even though her compliance and progress were so good that Z.G. was returned to her custody at the six-month review hearing and remained in her custody under court and CFS supervision for the next two years, Mother did not make reasonable efforts to treat the problems that led to Z.G.'s removal.

3

On this record, it is arguably impossible to make that finding by that standard of proof. To defeat bypass, a parent's efforts need not be perfect and need not be successful—they need only be reasonable. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 221; *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.) Mother completed her case plan, got Z.G. returned to her at the six-month review, and maintained Z.G. in her custody under CFS supervision for two years. It is hard to imagine how a court could find by clear and convincing evidence that Mother did not make reasonable efforts to treat the problems that led to Z.G.'s removal.

But Mother does not need to show that it was *impossible* to bypass her as to A.G. Rather, to prevail on her claim of ineffective assistance of counsel, all that Mother needs to show is that it is *reasonably probable* that she would not have been bypassed were it not for counsel's deficient performance. (*In re A.R.* (2021) 11 Cal.5th 234, 252.)

That is not a close question. If counsel had provided Mother with competent representation and thus had informed the court that Mother was not out of time for reunification services as to A.G., it is at least reasonably probable that the court would have rejected application of the bypass provision because the court could not find by clear and convincing evidence that Mother had failed to make reasonable efforts. Again, a contrary ruling arguably would not have been supported by substantial evidence.

Mother's claim of ineffective assistance of counsel is therefore meritorious. By failing to inform the juvenile court of its error in bypassing Mother as to A.G. and failing to file a writ petition raising the issue, counsel failed to act in a manner to be expected of

4

reasonably competent dependency practitioners, and it is at least reasonably probable that Mother would not have been bypassed in the absence of counsel's dereliction. (*In re A.R.*, *supra*, 11 Cal.5th at pp. 251-252.) We should accordingly reach the issue of the erroneous bypass despite subdivision (*l*)(2) of section 366.26, which would otherwise bar consideration of challenges to rulings made in setting a selection and implementation hearing if no timely writ petition was filed.

Because it is at least reasonably probable that Mother would not have been bypassed as to A.G. but for the juvenile court's error and counsel's failure to spot it, we should reverse the termination of parental rights as to A.G. And because A.G. and Z.G. have lived together for the entirety of their young lives, it is reasonably probable that the sibling bond exception to termination of parental rights would apply (§ 366.26, subd. (c)(1)(B)(v)), so we should reverse the termination of parental rights as to Z.G. as well. We cannot know whether efforts to reunify Mother with A.G. would be successful. But Mother "has earned the right to try." (*In re Albert T.*, *supra*, 144 Cal.App.4th at p. 221.)

I therefore respectfully dissent.

MENETREZ

J.

5